UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,           No. 11-CR-20492
                                   Hon. Nancy G. Edmunds
vs.                                     Hon. Gerald E. Rosen

OBIEL LUNA-SANTILLANES,

           Defendant.
_____/

ORDER REGARDING DEFENDANT'S MOTION
CHALLENGING THE JURY SELECTION PROCESS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on August 14, 2012

PRESENT:   Honorable Gerald E. Rosen
                      United States District Chief Judge

Defendant Obiel Luna-Santillanes has been charged in a multi-count drug conspiracy indictment. On July 24, 2012, less than a week before the scheduled commencement of trial, Luna-Santillanes, who is a Mexican citizen, filed a two-page "Motion Challenging the Jury Selection Process." Defendant asserts in this motion that the jury selection process in the Eastern District of Michigan "produces an under[-]representation of Hispanics" thereby violating his constitutional right to a trial before a jury comprised of a fair cross section of the community. [*See* Defendant's Motion ¶¶ 2-5].

1

Defendant contends that the Court "must conduct a hearing to determine wither there is an under-representation of Hispanics in the Eastern District of Michigan jury array." *Id.* at ¶ 5. As part of the relief requested, Defendant further asks the Court to "order[] the access to the jury records relating to Hispanics in the jury array." *Id*.

Pursuant to Eastern District of Michigan Administrative Order No. 00-AO-060, the normal scope of discovery with respect to information concerning jurors and potential jurors afforded a party seeking to challenge the composition of a grand and/or petit jury on the basis of race or ethnicity is limited to "juror number; race; and Hispanic ethnicity." Admin. Ord. No. 00-AO-060. This Administrative Order further provides that

> in the event that a party moves for the provision of juror information
> beyond that contemplated in this Administrative Order, such motion will be
> referred to the Chief Judge [for] review[] and ruling upon the propriety of
> providing any such additional juror information for good cause shown by
> the movant, on a case-by-case basis.

*Id*.

Because Defendant's broad request for access to jury records seeks such additional juror information, it has been referred for a determination by this Court.[1] Having reviewed the parties' briefs, the Court has determined that the relevant facts and legal

---

[1] Although Defendant's motion purports to challenge the jury selection process as violative of his constitutional right to a trial before a jury comprised of a fair cross section of the community [*see* Defendant's Motion ¶¶ 2-3], the Court views its inquiry as limited to Defendant's request for juror information and records, as opposed to the merits of any constitutional challenge he might pursue using such juror information. Nonetheless, as discussed below, the substantive law governing such a constitutional challenge has some bearing upon the Court's disposition of the present motion.

arguments are adequately presented in these written submissions and oral argument would not aid the decisional process. Accordingly, Defendant's Motion will be decided "on the briefs." *See* E.D. Mich. Local Rule 7.1(f)(2).

## II. DISCUSSION

A. THE JURY SELECTION PROCESS IN THE EASTERN DISTRICT OF MICHIGAN, DETROIT DIVISION

Under the juror selection plan adopted by the Judges of this District in 2000 and subsequently approved by the Judicial Council of the Sixth Circuit, potential jurors are drawn from a "master jury wheel" in which "each county within a division is proportionately represented." *See* Administrative Order No. 00-AO-083, Juror Selection Plan § (h)(2); *see also United States v. O'Reilly*, No. 05-80025, 2008 WL 115537, at *2-3 (E.D. Mich. Jan. 10, 2008) (Friedman, C.J.) (describing this District's current juror selection plan). The exact percentages of this mandated "proportional representation," in turn, are determined by reference to the numbers of registered voters in each county within the division.

The process of creating the master jury wheel for the Detroit Division was recently described in detail in *United States v. Ferguson,* ___ F. Supp. 2d ___, 2012 WL 1957059 (E.D. Mich. May 31, 2012):

> The jury-selection process begins when the Eastern District's Jury Department obtains three lists from the Michigan Secretary of State: registered voters, licensed drivers, and holders of state-issued identification documents. Juror Selection Plan § (f); . . . [s]ee also 28 U.S.C. § 1863(b)(2) (a district must use "some other source or sources of names in addition to voter lists" if doing so is necessary to ensure representativeness and avoid

excluding jurors on the basis of race, color, religion, sex, national origin, or economic status).[2] The Jury Department provides the list of registered voters to Sutera Data Systems ("SDS"), a data-processing firm contracted to compile the Master Wheel. Juror Selection Plan § (g)(3) (Jury Department may hire outside contractors to implement the Plan). . . . SDS determines the number of registered voters in each of the nine counties comprising the Detroit Division, and calculates each county's proportionate share of the Division's total voting population. Based on these figures, the Court issues an Administrative Order to create a new Master Wheel for the Division, in which it specifies the number of people to be drawn from each county for possible jury service. Juror Selection Plan § (h)(2) (voter-registration lists must be used to determine the proportion of jurors from each county). . . .

The Jury Department next provides the list of licensed drivers and holders of state-issued ID cards to SDS, with instructions to create the Master Wheel; it is to be filled with actual names of potential jurors. SDS begins by making separate lists of licensed drivers and state ID holders for each county in the Division. Next, for each county, SDS merges the three lists (registered voters, licensed drivers, people with state-issued IDs) and eliminates duplicate names. . . . Finally, SDS selects names at random from the merged list for each county, based on the proportions set forth in the Administrative Order, to create the Master Wheel. . . .

---

[2] While this District's jury selection plan makes use of state-provided lists of licensed drivers and state ID holders as a supplement to the list of registered voters, it is important to note that this effort to augment the jury pool has been voluntarily implemented rather than legally compelled. The Sixth Circuit has recognized that "[v]oter registration lists are the presumptive statutory source for potential jurors," and that "[t]he circuit courts are in complete agreement that neither the [JSSA] nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population." *United States v. Odeneal,* 517 F.3d 406, 412 (6th Cir. 2008) (internal quotation marks, alteration, and citations omitted). Indeed, so far as the Court is aware, this District's use of lists of licensed drivers and state ID holders is rare, if not unprecedented, among the federal district courts. Moreover, the plan used in this District prior to this supplementation was approved by the Judicial Council of the Sixth Circuit, and the addition of licensed drivers and state ID holders was made at the recommendation of a jury analyst, rather than as a result of any perceived legal obligation to do so. *See United States v. Jones,* No. 01-80571, slip op. at 9, 13 (E.D. Mich. May 14, 2004) (Zatkoff, C.J.).

In the next step, the Jury Department randomly draws 5,000 names from the Master Wheel and sends juror questionnaires to these people.  See Juror Selection Plan § (i)(1) (Clerk of the Court decides how many names are necessary to maintain "an adequate number of names" in the jury wheel).  At this point, questionnaires may fall into one of three categories: (1) "non responses," which are questionnaires never returned; (2) "undeliverables," questionnaires returned unopened by the Post Office; and (3) "completed" questionnaires filled out and returned by their intended recipients.

The Jury Department's procedure for following up on undeliverables and nonresponses is limited.  If the Post Office provides a forwarding address for an undeliverable, the Department mails a questionnaire to the new address; if no address is provided, no further action is taken. . . . .  The Jury Department also sends follow-up questionnaires to nonresponses; however, there is no standard practice if the second mailing elicits no response. . . .  Juror Selection Plan § (j).

The Jury Department then processes the completed questionnaires and decides who is not qualified or who should be excused.  Noncitizens, convicted felons, and people who cannot read and write English, among others, are disqualified from jury service under federal law.  Juror Selection Plan § (k); 28 U.S.C. § 1865(b).  Active members of the armed forces, police and fire department members, and certain public officials are also exempt.  Juror Selection Plan § (m); 28 U.S.C. § 1863(b)(6).  The Eastern District also exempts people over 70, firefighters and ambulance crews, and persons who served on a jury within the last two years.  Juror Selection Plan § (l).  Once unqualified and exempt respondents are eliminated, what remains are the completed questionnaires of people who will make up the Detroit Division's Qualified Jury Wheel ("the Qualified Wheel").

* * *

Each Master Wheel is kept in service for two years. . . .  After two years, the Master Wheel is retired, even if some names remain which were never sent questionnaires or selected for placement in the Qualified Wheel.  For example, the 2004–2006 Master Wheel contained 100,000 names, but the Jury Department mailed only 50,650 questionnaires; the remaining names were not used. . . .  Records relating to old jury pools, Master Wheels and Qualified Wheels, are kept for a minimum of four years and are

>available for public inspection. Juror Selection Plan § (s)(2); 28 U.S.C. § 1868.

*Id.* at *1-3 (quoting *United States v. Bates*, No. 05–81027, 2009 WL 5033928 (E.D. Mich. 2009), *aff'd*, 2012 WL 1071806 (6th Cir. Apr. 2, 2012)).

B.      DEFENDANT LUNA-SANTILLANES' MOTION

Defendant Luna-Santillanes claims that the jury selection process in the Eastern District of Michigan produces an under-representation of Hispanics. As a result, he claims that he will not have "a fair cross-section of Hispanics in his jury array." Defendant's Motion, p.1, ¶ 3. Presumably to substantiate his contentions, he seeks an order granting him "access to the jury records relating to Hispanics in the jury array." *Id.*, p. 2.

1.      The Standards Governing Defendant's Motion

To the extent that a party seeks more detailed information and records regarding this District's process for juror selection, and not merely the disclosure of juror number, race, and Hispanic ethnicity, Administrative Order No. 00-AO-060 provides that such requests will be reviewed on a "case-by-case basis," and will be granted only upon a showing of "good cause." As explained by former Chief Judge Lawrence P. Zatkoff, a party may establish the requisite "good cause" by showing that the requested information is necessary to prepare and present a motion challenging the jury selection process. *United States v. Montini*, No. 03-80228, 2003 WL 22283892, at *3 (E.D. Mich. Sept. 3, 2002) (Zatkoff, C.J.); *see also O'Reilly*, 2008 WL 115537, at *3 (Friedman, C.J.)

Accordingly, to establish entitlement to the information sought through the present motion, Defendant must show that these materials will be of assistance in proving a violation of the Jury Selection and Service Act (the "JSSA") or a Sixth Amendment violation.[3]

2. Defendant Has Not Shown a Need for Information Beyond That Which Is Ordinarily Available in Order to Determine Whether the Jury Selection Process in His Case Violated the JSSA or his Sixth Amendment Rights

As this Court previously has explained, "[t]he Sixth Amendment guarantee of an 'impartial jury' has been construed as encompassing the right to a jury drawn from a fair cross section of the community." *United States v. Brown*, 128 F. Supp. 2d 1034, 1038 (E.D. Mich. 2000) (internal quotations and citations omitted). Likewise, the JSSA articulates a "policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

A claim that jury selection violates the "fair cross section" requirements of the Sixth Amendment and the JSSA can be proven through direct or indirect evidence. *See*

---

[3] Defendant does not specify the basis for challenging the process of selecting a jury array other than to broadly assert that there will not be a "fair cross section of Hispanics in his jury array" and make a broad reference to "a constitutionally required trial." However, since both the JSSA and the Sixth Amendment are premised upon a litigant's entitlement to a trial before a jury drawn from a fair cross section of the community, the Court will assume that Defendant bases his motion on the JSSA and the Sixth Amendment.

*United States v. Ovalle*, 136 F.3d 1092, 1099 (6th Cir. 1998); *see also Brown*, 128 F. Supp. 2d at 1039.  Where, as here, there is no direct evidence that the jury selection process used in this District invariably leads to the under-representation of the group identified by Defendant Luna-Santillanes, Defendant must rely upon indirect evidence to sustain his claim.  Defendant's initial burden is to establish the three elements of a *prima facie* showing of a "fair cross section" violation:  "(1) that a 'distinctive group' is being excluded from the jury pool; (2) that the representation of this group in venires from which juries are selected is 'not fair and reasonable' in comparison to the group's representation in the community at large; and (3) that this disparity is attributable to systematic exclusion of the group in the jury selection process."  *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668 (1979); *see also United States v. Buchanan*, 213 F.3d 302, 309-10 (6th Cir. 2000);  *Brown*, 128 F. Supp. 2d at 1039.  Each of these elements must be established in order to make out a *prima facie* case.  *United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir.1998); *United States v. Grant*, 2009 WL 3275926, at *12 (S.D. Ohio 2009).

Defendant does not dispute that Hispanics qualify as a "distinctive group" whose alleged exclusion would satisfy the first prong of a *prima facie* case.   Accordingly, the Court will proceed to the remaining two prongs of a *prima facie* showing of a fair cross section violation.

To satisfy the second element of his *prima facie* case, Defendant must show that the representation of Hispanics in the pool from which juries are selected in this District

8

is not "fair and reasonable" in comparison to the representation of these groups in the community-at-large. *See United States v. Fieger*, EDMI No. 07-20414, 2008 WL 1902054 (E.D. Mich., Apr. 29, 2008). Under the third prong of this standard, Defendant must show that any such disparity in the representation of Hispanics is "attributable to systematic exclusion of the group in the jury selection process." *Id*. Thus, merely showing a group is under-represented -- which is all that Defendant hopes to show here -- does not equate with a "systematic exclusion" of the group. *See United States v. Bates*, 2009 WL 5033928 at * 16 (E.D. Mich. 2009) (holding that African-Americans were substantially under-represented in Detroit's mater jury wheel but finding "nothing in the record indicating that the racial disparity at issue was caused by the Eastern District of Michigan's jury selection procedures"), *aff'd*, 2012 WL 1071806 (6th Cir., Apr. 2, 2012).

    Although the Court is cognizant that the question at the present juncture is not whether Defendant has made a *prima facie* showing of a fair cross section violation, but whether the additional information he seeks would aid him in establishing the elements of such a showing, the Court cannot approve Defendant's blanket request for juror information based on nothing more than the speculative assertions and unfounded assumptions contained in his motion. To hold otherwise would essentially sanction a "fishing expedition" every time a defendant requests discovery beyond that contemplated in Administrative Order 00-AO-060 based on nothing more than speculation and supposition, and would impose a heavy burden, in terms of time and cost, on the Court

9

and its Jury Department. *See United States v. Fieger*, *supra* (denying defendant's request for production of "all records and documents revealing the composition of the master jury wheel" where defendant suggested no basis for believing that the wheel might be the source of any systematic under-representation of a particular group in this District's jury pools, concluding that the defendant's request for materials bearing on the composition of the master jury wheel "resembles nothing more than a 'fishing expedition.'"); *United States v. O'Reilly*, 2008 WL 115537 (E.D. Mich., Jan. 10, 2008) (Friedman, C.J.) (denying defendant's motion for disclosure of non-public juror records, noting that if it were to allow the defendant to obtain this information, "it is certain that defendants in the future will seek the same or similar information, which will cause a tremendous administrative burden."); *see also United States v. Montini*, 03-80228, 2003 WL 22283892 (E.D. Mich. Sept. 3, 2002) (Zatkoff, C.J.).

## CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's request in his Motion Challenging the Jury Selection Process [Dkt. # 73] for "access to the jury records relating to Hispanics in the jury array," is DENIED. Defendant is entitled, however, to review the information regarding juror number, race, and Hispanic ethnicity for the current jury wheel. *See* E.D.Mich. Admin. Order No. 00-AO-060. Defendant also may review any records relating to old jury pools, master wheels, and qualified wheels that have been retained in the jury department and are available for public inspection pursuant to Juror Selection

Plan § (s)(2) and 28 U.S.C. § 1868.[4]

                                                       s/Gerald E. Rosen
                                                       Chief Judge, United States District Court

Dated: August 14, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 14, 2012, by electronic and/or ordinary mail.

                                                       s/Carol A. Hemeyer
                                                       Case Manager

---

[4] The JSSA only prohibits the Court clerk from disclosing records and papers involved in the creation of a master wheel until the wheel has been emptied and all jurors selected from that wheel have completed their service. 28 U.S.C. § 1867(f). The records and papers from all other master jury wheels are kept on public record in the Court clerk's office for at least four years. 28 U.S.C. § 1868. Thus, the pertinent materials for this District's past, retired and emptied master wheels are available to Defendant without court order.